### FISCHER MFG. CO. v. LAWRENCE.

(District Court, E. D. Wisconsin. October 15, 1912.)

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BUNION PROTECTOR.

> The Bronnenkant patent, No. 739,824, for a bunion protector, was not anticipated and discloses patentable invention; also *held* valid as against the claim of prior use and invention by others, and infringed.

In Equity. Suit by the Fischer Manufacturing Company against James Lawrence, doing business as the Williams-Lawrence Shoe Company. On final hearing. Decree for complainant.

Erwin & Wheeler, of Milwaukee, Wis., for complainant.

Hugo J. Trost and A. L. Morsell, both of Milwaukee, Wis., for defendant.

GEIGER, District Judge. The complainant, as owner of letters patent No. 739,824, issued September 29, 1903, to James Bronnenkant, filled its bill, charging infringement. The device embodied in the invention covered by the letters patent is a bunion protector. It may in a general way be described as a concave truss embracing the front and inner side of the foot; one part supporting the front of the arch of the foot, to prevent it from settling and spreading laterally under pressure applied in walking, while another part prevents the rear end of the phalanges from spreading, and still another encircles the bunion to relieve it from pressure. It has top and bottom retaining wings, which support the pad, retain it in position, and assist with diminishing pressure to support the parts of the foot toward and at the margin of the weakened zone in which the bunion is located. The material to be used in its construction is specified to be preferably leather. Further description of the device, as shown by the specifications, as well as exhibits produced, may be given as follows:

A nearly oval piece of stiff leather is concaved so as to conform to the forward inner side of the foot. A sort of pocket is formed, which will receive the projecting portion of the foot found at or near the great toe joint. The inventor has placed toward the forward middle portion of the device an opening about an inch in diameter, and which is at the bottom of the so-called pocket. The portion of the device which is at the front, and alongside the great toe, is referred to as the shoe toe support or filler, the portion at the rear is called the in-

---

step support, while the intermediate portion is called the ball or joint pocket. The claims are stated as follows:

"1. A metatarsophalangeal great toe joint protecting device, provided with an opening for said joint, a support for the shank or instep and a shoe toe support.

"2. A metatarsophalangeal great toe joint protecting device, comprising an elongated shieldlike construction, adapted to rest against the side of the foot, and having at its medial portion a centrally located aperture for receiving the lateral projection of said joint and, encircling such projection of the joint, and a rearwardly extending shank, widening and thickening rearwardly, so that it is adapted to fit along its length against the side of the foot and to bear against and support the instep.

"3. A metatarsophalangeal great toe joint protecting device, provided with a shoe toe support and a shank or instep support, connected together by means of a reduced portion adapted to form a pocket for said joint."

The defenses are noninfringement; invalidity of the claims of the patent, as constituting mere aggregations of the devices of the prior art; invalidity, on account of two years' public use and sale; and invalidity of the claims in suit, in view of prior inventorship, knowledge, and use.

Except for differences in two particulars which will be noted later, the defendant's device is exactly like the complainant's. By this is meant that the complainant's exhibit of the patented device and its exhibit of the defendant's alleged infringing device are alike. Both are of identical material, of the same appearance, and the lineal measurements of the whole and the several parts—i. e., the front and rear parts, the aperture, and the degree of concavity of each—are so identical that one may be exactly superimposed upon the other. The defendant, to meet the situation (except as to the two particulars to be noted), strenuously insists that complainant's device fails radically to conform to the claims of the patented structure in one of the essential and fundamental elements; that the defendant's device, though conceded to be a duplication of the complainant's, likewise lacks the same essential and fundamental element; therefore it cannot infringe the patented structure. To be more specific, the contention is this: The first claim calls for "a support for the shank or instep"; the second, "a rearwardly extending shank, widening and thickening rearwardly, so that it is adapted to fit along its length against the side of the foot and to bear against and suppo.t the instep"; and the third, "a shank or instep support," etc. Further, the specification refers to the device as a means of filling the portion of the shoe in front of and behind the enlarged joint, "whereby a support will be afforded for the shank or instep," and the rear portion of the device is designated as the "instep" or "shank" support. Again, one of the drawings accompanying the specifications exhibits the device as it rests within a shoe, and therein it is indicated by dotted lines as extending rearwardly, on the lateral and lower side of the arch, nearly to the heel of the shoe. It is claimed that the complainant's exhibit of its patented structure and the complainant's exhibit of defendant's alleged infringing structure each lacks the element of the instep or shank support. Hence it is urged, as stated, though they are alike, if they are

wanting in the embodiment of this element, found in each of these claims, infringement is not established, because neither conforms to the patented structure.

It is conceded that the terms "instep" and "shank," as used in the claims and specifications, are inapt. What is intended to be referred to is the "arch," or that portion of the foot beneath the instep between the heel and the ball of the foot. The question is therefore presented whether either device meets the requirements of the patent and its claims respecting the supporting features referred to. The complainant at the outset contends that the claims must be given a fair construction, not as disclosing the arch support as a primary or principal feature, but as one of several elements combined into a metatarsophalangeal great toe joint protecting device.

It is pointed out that a bunion is a swollen or diseased condition found at the joint or point of articulation of the metatarsal and phalangeal bones of the foot; and the object of the device is to restore, or aid in restoring, the normal anatomical condition by straightening the joint through pressure applied fore and aft the points needed, viz., at the hollows of the phalanges and metatarsal bones, and, to do this, render support to the arch, or at least such part of it as tends to exert pressure forward through the metatarsal bone immediately articulating at the toe joint. The protection of the bunion from contact with the shoe, the conformation of the device so as to be self-retaining, and the tilting of the foot slightly outward, so as to relieve the inner side from pressure, are further features urged as contributing toward the accomplishment of the main purpose of protection at the joint. Therefore, claims the complainant, there being nothing in the claims or specifications requiring the device to extend rearwardly under the whole arch of the foot, as might be necessary were such device intended primarily to serve as an arch support, the circumstance that the drawing indicated the rearward extension as far as the heel may be ignored, provided the devices as made by either party substantially meet the calls of the claims, and give a reasonable amount of support, and relieve pressure at the desired point, viz., the great toe joint, where the bunion is found. In other words, it being possible to obtain the desired results through some support afforded to the metatarsal bones just behind the joint, the device need satisfy no other or larger hypothesis.

This construction given to the claims seems to be fair and reasonable, and is consistent with the inventor's declared object "to produce a device for protecting these swollen joints against irritating pressure, a device adapted to be placed against the inner side of the foot, and together with the foot to be inserted within the shoe or boot, whereby those portions of the boot or shoe in front of and behind the enlarged joint will be filled, and whereby a support will be afforded for the shank or instep of the foot." Throughout, the prime object to be attained was to relieve the situation as found at the joint by overcoming both the lateral and downward pressure at the joint and at the forward part of the arch. Nothing appears, in the claims, specifications,

or elsewhere, that support for the whole arch of the foot was necessary for its accomplishment.

The question then recurs, whether the device produced by complainant meets the call of the claims as thus construed. That it does is shown by an examination thereof, as well as by witnesses testifying to their experience in its use. The device in evidence extends rearwardly from the center of the aperture which encircles the bunion approximately three inches, and inwardly under the foot at a radius diminishing to about two inches; the latter, however, not indicating the extent actually covered on the under part, because the device is concaved to conform to the side of the foot. But, with an extension rearward of approximately three inches from the joint, a concave pad approximately four inches in width manifestly covers very considerable of the forward and lateral surface of the arch, and, being stiff and of a certain thickness, acts as a support and filler, tending to relieve or shift pressure. This view is amply corroborated by witnesses who have made use of the device, or who, as physicians or chiropodists, were able to speak authoritatively respecting the experience of others in its use. All such witnesses are in substantial accord respecting the performance by complainant's device of the function of giving support to the arch sufficient to relieve pressure and prevent spreading at, and to promote straightening of, the toe joint. Some of the testimony seems to have been given with a clear appreciation of complainant's contention respecting the claims in question, while some of it, given by laymen not familiar with such contention, in different language, but with equal clearness, reaches the same conclusion and apparently recounts similar experiences; and the testimony as a whole furnishes cogent corroboration of the complainant's contention. The conclusion is therefore reached that the claims in suit require in the patented structure such reasonable and substantial support of the arch as may be necessary to perform the functions last above indicated, but there is nothing in the patent or its claims imperatively requiring the supporting part of the structure or device to extend over the whole arch of the foot; that complainant's exhibit meets the requirements of the patent and its claims; that defendant's device, being identical (as to this feature), infringes.

Defendant claims, however, that its device embodies a radical departure from the patented structure, and from complainant's device, in this: In the construction of the former, the upper wing or flap is split or cut across from the circular aperture, and the two parts brought together overlapping, and on the lower wing beneath the aperture a flat steel spring about two inches long and one-quarter inch wide is imbedded. It is urged that this introduces an improvement not found in the patented structure, in that the device becomes self-conforming, and that it successfully overcomes a tendency of the complainant's device to buckle or wrinkle. The success which has attended the sale of complainant's device—about 150,000 per annum—rather negatives the idea that it is wanting in the particular claimed; and the witnesses who testified on this feature failed or refused to

grant defendant's device any especial merit on the strength of the variation. While it may not strictly be called a merely colorable change, made to evade the charge of infringement, there is much force in complainant's contention that the defendant fully recognized that slitting the upper wing resulted in a loss for which compensation is made in the imbedding of the steel strip beneath the aperture. No claim is made that a new function is introduced, or that, without this variation, the function claimed by the patented structure could not be reasonably well performed, and it seems to me to be an immaterial variation.

The claims of the patent are attacked as lacking invention, the differences over what the prior art discloses being in degree only, and, further, that the claims are invalid, being mere aggregations of devices disclosed in prior art patents. In support of this, reference is made to these patents: Dadisman, No. 434,979; Baird, No. 545,006; Georges, No. 663,224; Gunthorp, No. 730,366; Kennedy (British), No. 19,607. Concededly, Bronnenkant was not first to conceive the idea of a pad or protector for a bunion. But counsel for complainant is apparently right in his contention that the cardinal idea as disclosed in the prior art seems to have been to provide a structure to relieve against *shoe pressure* on the bunion. The notion doubtless prevailed that a bunion was caused by shoe pressure, and that a cure or relief was obtainable through the removal of such cause. Thus Dadisman states the object of his invention to be to "obtain a bunion protector of the character named, which shall protect the bunion from the pressure of the shoe and stocking, * * * thereby giving the bunion a chance to heal." Baird's object was to "provide a padded insole, consisting of a double walled sole having one or more filling adjusting openings therein," with padded extensions upward over the instep. Georges claimed an "improvement on bunion and corn shields in which there is a recess to receive the pressure of the boot or shoe," and to provide as an additional feature "a cushion and fill out the otherwise empty space * * * immediately on the side of the bunion." Gunthorp's device is expressly declared "specially intended" to relieve or cure "flat foot," requiring, necessarily, support for the whole arch.

An analysis of these various patents shows that no one contains either the conception of the patent in suit respecting the true anatomical malformation found in a bunion or Bronnenkant's method of mechanically relieving it. His basic idea seems to be that a bunion, disclosing a displaced, loose-jointed, and swollen condition at the point of articulation, must be treated by application of the proper degree of pressure to the zone containing the particular bones involved, so that each may be restored, or the tendency to further spread, checked. He claims to accomplish this by a device exerting pressure distant from the joint, upon the phalangeal bone of the great toe and upon the connecting metatarsal bone, and the device is so shaped that the pressure is not exerted upon the bunion. Naturally, in carrying out this idea, recourse was had to some sort of pad. But lack of invention in the patent in suit is not established because the prior art de-

vices disclose the use of pads which, in order to accomplish the cardinal purpose of relieving *shoe pressure,* incidentally cover a portion or·more of the zone to be covered by the device in suit, unless the same functions and the same purpose are also substantially performed and accomplished. And I think the patent in suit is not only distinguishable from each of the prior art devices, but from all of them, and it is, not a mere aggregation of their elements. The extension and conformation of the device to exert pressure upon the particular bones and their joint, as disclosed, embodies an idea and accomplishes a purpose not found in the prior art, and this meets the defendant's claim that the differences are in degree, that they consist of a selection .of known means, a more extended application of the original thought, and the like.

It remains to consider the defendant's contention that the patent in suit, which was dated September 29, 1903, issued upon an application filed October 25, 1902, is void because of two years' use and sale; also the prior knowledge and invention of the device disclosed therein. This involves an examination of the evidence in the light of the presumption of validity, and the consequent burden upon the defendant,· not only to overcome such presumption, but to establish the defense clearly, explicitly, and "beyond a reasonable doubt."

The proofs offered by the defendant are claimed to establish a sale and use of the infringing device in the year 1899. The applications for the various patents urged by defendant as showing lack of invention in the device in suit were filed in 1889, 1902, 1894, 1902, and 1900, before the date of the application for the patent in suit. The defendant has seriously, but unsuccessfully, contended that the device in suit lacked invention, because anticipated by, or as being an aggregation of features embodied in, the prior art as evidenced by these different patents. It ought not, therefore, to complain if its proofs, offered to establish lack of invention, anticipation by, and the sale and use of .an unpatented infringing device in 1899, be required to satisfy to the utmost the rigorous rule respecting the exclusion of a reasonable doubt.

Three witnesses are produced to substantiate this defense. One, Schultz, testified to the manufacture and sale of the device at Buffalo in the year mentioned. He procured a patent eight years later, since when and under which patent he has manufactured protectors on a larger scale. At the time of testifying—1911—he first stated that he had manufactured protectors for 12 or 15 years. No sample of the ·structures made by him at the beginning is produced; but four different exhibits are identified as structures made at a much later period —probably subsequently to the issuance of the patent to him in 1907 —and, excepting one, apparently well-finished, machine-made products.

These several exhibits, being presented to him, were in a general way referred to as "patterns," doubtless meaning that they were of styles similar to those first manufactured by him. With respect to the first of these, and which he characterizes ·as the "old pattern," his

initial statement was that he could not say exactly when he first began to manufacture it. He had testified generally that he began the manufacture at Buffalo in 1899, although he had made some protectors during previous three years' residence at Rochester. Later, his attention being again directed to fixing the date when he first manufactured this so-called pattern, he stated that it was 10 or 12 years; and then, the infirmity of the answer being apparent (the date of his first manufacture could not be later than October 25, 1900), to a leading question whether he was to be understood as meaning 1899, answered affirmatively.

The testimony respecting the other exhibits, so far as the time of original manufacture was concerned, is equally indefinite, though he aims usually to fix the year 1899 as the original date. Corroboration of his testimony is sought from two other witnesses, one of whom confines himself to the bare statement that he purchased a protector from Schultz in October, 1899. The other witness, however, after testifying to the purchase of a protector from Schultz in 1899, sought to corroborate his testimony by the circumstance of selling a piece of property, or trying to sell it, at or about the same time; but later, by way of further corroboration, and to more definitely fix the date, stated that it was at the time of the Pan-American Exposition, when President McKinley was assassinated—undeniably in 1901.

The principal witness, Schultz, was unable to give a single direct or indirect corroborating circumstance to fix with precision the date of manufacture in 1899, or to give the names of customers other than the two witnesses produced, to give definite or proximate dates of other occurrences connected with his patent, his business, or other matters connected with the subject of his examination. No books, memoranda, or written data of any description are produced, and the bare statement of original manufacture in 1899 is cast into grave doubt because of his own and the other witnesses' quite certain statements of other dates. If the question were merely whether there is a preponderance of testimony, or whether the testimony justifies the inference as to the year 1899, the showing thus made might suffice; but it does not meet the exactions of the rule requiring all reasonable doubt on the matter to be excluded. Counsel for defendant has referred to the testimony of these three witnesses as uncontradicted. This may be true, in the sense that it is not disputed by other witnesses. But a reasonable doubt arises as naturally out of self-contradiction, as disclosed in this record, as it may arise out of direct negation by other witnesses.

A further fatal weakness of the testimony, as establishing the defense of prior use, is found in the failure of these witnesses, or any of them, to establish, as required, that the devices manufactured more than two years prior to the date of application for the patent in suit embodied the elements of the patented structure. The situation being as described, a general statement of a witness, examining in 1911 an exhibit which is a well-finished, machine-made product of recent manufacture, that a hand-made device made by him 12 years before "was like" the exhibit, can in no fair sense be regarded as direct and ex-

plicit proof. In this connection it must be borne in mind that the witness Schultz testified respecting the method of manufacture pursued by him originally, that he cut out a piece of leather by hand, moistened it, and nailed it to a last, putting padding into it, and in some cases inserting it in the shoe; doubtless in other cases the pad was thus made and intended to be placed on the foot. It was not attempted to make reasonable and careful comparisons of the alleged device manufactured in 1899 with the later exhibits or the patented structure, by producing measurements, disclosures of conformation, contour, and the like. Where, as hereinbefore intimated, the patent in suit, the patented devices of the prior art, have all been subjected to the closest analysis by the parties, with a view of proving invention, or a lack of invention, it seems to me that proof of lack of invention, by reason of anticipation by a prior unpatented device, ought to approach the same degree of directness and explicitness. This to my mind is the fatal weakness of the defendant's proof; and the case strongly illustrates the infirmities of oral evidence to support the issue that has been tendered.

Counsel for defendant calls attention to what is evident in the record, that the witnesses upon this issue, particularly Schultz, were lacking in intelligence and power of expression. This may explain the infirmity of the testimony, but can neither add to its probative force nor call for resolving the doubts arising thereon, in favor of, rather than against, the defendant. The latter course is required. I think the defendant has failed to establish this defense.

The general conclusion is that the patent in suit is valid, that infringement has been established, and the complainant is entitled to a decree accordingly.